308 Ga. 492
FINAL COPY

S20A0006.  KELLER v. THE STATE.

BOGGS, Justice.

Randall Guy Keller was convicted of felony murder and related crimes arising out of the beating death of his ex-wife's two-year-old son, William Powell. He appeals, asserting numerous claims of error, including ineffective assistance of counsel, the trial court's rulings on motions before and during trial, several evidentiary rulings, and alleged bias on the part of the trial judge. For the reasons stated below, we affirm.[1]

---

[1] Powell was injured on the morning of June 7, 2013, and died two days later. On May 26, 2015, a Muscogee County grand jury indicted Keller for malice murder, felony murder, first-degree child cruelty, second-degree burglary, possession of less than one ounce of marijuana, and two counts of possession of drug-related objects. Keller was tried before a jury from March 27 to April 6, 2017. The jury acquitted Keller of malice murder but found him guilty of all remaining charges. On May 11, 2017, the trial court sentenced Keller to serve life in prison without the possibility of parole for felony murder, plus five years consecutive on the burglary count and 12 months consecutive for each drug count. The court merged the child cruelty count into the related felony murder count. Keller filed a timely motion for new trial, which he amended on January 9, 2019. After an evidentiary hearing, the trial court denied the motion on June 11, 2019. Keller filed a timely notice of appeal, and

1. Construed in the light most favorable to the jury's verdicts, the evidence at trial showed that at the time of the murder, Keller, who was separated from his second wife, was living in Columbus with his first wife, Ashley Keller, their two daughters, six-year-old T. K. and five-year-old J. K., Ashley's son from another relationship, two-year-old Powell, and Ashley's brother, Dustin Burwell. Keller also had another son from his second marriage, who visited from time to time. Keller disliked Powell, treated him differently from his daughters, and verbally abused him.

In the first week of June 2013, Keller lost his job and learned that he was going to need a lawyer for a custody dispute with his second wife over their son. On June 6, 2013, Keller wrecked his car. That afternoon, he and Ashley argued about his treatment of Powell, and Keller kicked and damaged a door.

At approximately 2:00 a.m. on June 7, Keller went outside to confront his neighbors with regard to a drug deal that he believed

the case was docketed in this Court for the term beginning in December 2019 and submitted for decision on the briefs.

had taken place in front of his house. After a short time Keller came back in the house and told Burwell that "stuff was going down" and he needed help. Burwell went outside with him, and they confronted the neighbors. One neighbor, Regina Mathis, was awakened by her daughter, who told her that there was a man in the yard. Mathis looked out, saw Keller enter her truck and attempt to break into another car, and called the police. When the police arrived, they told everyone to go back in their houses and not talk to each other. Keller was "very agitated" and "acting crazy." Mathis later discovered that a check stub and other papers were missing from her truck.

After the police left, some friends of Keller stopped by and stayed for about half an hour, and all the children were acting normally. After the visitors left, Ashley put the children to bed and began watching a movie. Powell got out of bed and came into the living room while Ashley was watching the movie, and she took him back to bed and checked on the two girls, one of whom was still awake. Later, she checked on the children again and they all were asleep, and she went to bed around 3:30 a.m., while Keller, who "did

not sleep much" due to his ADHD, stayed up "doing stuff in the house."

Keller's older daughter, T. K., heard a noise that woke her up, and she went to Powell's room, where Keller was standing in the doorway and angrily told her to go back to bed. T. K. later made a picture book with a counselor, in which T. K. recounted that she heard someone go into Powell's room and heard Powell choking, that she then went to Powell's room and Keller was there, that Keller told her to go back to bed, and that she saw Powell lying motionless on the floor.

Burwell was asleep when Keller, distraught and in tears, woke him up and told him that when Keller walked into Powell's room, Keller had found Powell lying there unconscious. Burwell saw Powell on the living room floor; he was cold to the touch, his lips were turning blue, and he was completely motionless. At around 4:00 a.m., Burwell woke up Ashley and told her that Powell was not breathing; Ashley ran into the living room and saw Powell on the floor with Keller performing CPR. Ashley called 911 and stayed on

the phone until the paramedics arrived at 4:30 a.m. Powell was in full cardiac arrest; the paramedics revived him and he was immediately transported to Columbus Regional Medical Center and placed on life support.

Doctors at Columbus Regional Medical Center performed a CT scan on Powell, which they initially read as normal. However, Powell was not behaving normally, so the doctors transferred him to Scottish Rite Hospital in Atlanta, where doctors re-examined the CT scan and concluded that it showed damage to Powell's brain and a skull fracture.

At Scottish Rite, Ashley spoke with police detectives and one of Powell's physicians, Dr. Tamika Bryant, about what had happened to Powell. Dr. Bryant told Ashley that Powell had a skull fracture and "it's not an accident." Ashley never told Keller that Powell had a skull fracture and did not speak to him about Powell's other injuries. Keller gave Ashley two different accounts of how and where he found Powell and told her not to speak to her family about what was going on.

On the same day, Brandyn Mullen rode back to Columbus with Keller and another man, Frank Smith, to pick up some of Powell's things. Mullen asked Keller what happened, Keller responded that "snitches get stitches," and he told Mullen there would be no snitching. When they arrived at the house, Keller immediately began using cleaner to clean Powell's room, even though the other rooms in the house were "a mess" or "normal kids' rooms." Keller was cold, anxious, and fidgety; over the course of the day he told Mullen four different stories about where and how he found Powell. Keller referred to Powell as "the body" even though he was still alive, did not visit Powell in the hospital, and said he was "sick and tired of Ashley" and was "thinking about taking the kids and going down to Florida."

Detectives obtained a search warrant and searched Keller's house the next day, June 8, while both Keller and Frank Smith were present. Detectives found marijuana, a smoking device, and a digital scale, as well as check stubs with Mathis' name on them. Detectives also obtained a warrant authorizing them to search Keller's phone,

which revealed Google searches at 4:12 a.m. and 2:50 p.m. on June 8 for "how many pounds of pressure to cave a human skull."

A second CT scan at Scottish Rite showed the skull fracture as well as progressive, significant damage to Powell's brain from lack of oxygen, bleeding on the brain, and brain herniation through the base of the skull. As a result of these injuries, Powell was taken off life support and died on June 9, 2013.

Keller was arrested for Powell's murder. On June 11, Keller made a telephone call to Ashley from the jail, in which he said that "it was an accident" and that Keller "liked to throw the kids on the couch" but "this time [Powell] didn't respond." At Keller's trial, a recording of that call was played for the jury.

Dr. Bryant, an expert in child abuse pediatrics, testified at Keller's trial that in her examination of Powell, she observed in addition to the brain injuries a spinal injury, multiple impacts to the back and both sides of his head, and bruises on his head and neck as well as the rest of his body. She further testified that these injuries, absent some explanation, were consistent with child abuse, were not

compatible with falling out of bed or falling down, and were the result of multiple blunt force trauma, which was consistent with Powell's head being slammed into something hard and flat like a hardwood floor.

Dr. Lora Darrisaw, the GBI forensic pathologist who performed the autopsy on Powell, noted multiple impact injuries to his head, including the skull fracture. Dr. Darrisaw testified that Powell's death was caused by multiple blunt force trauma consistent with his head being slammed into a flat, broad surface, that the injuries were inconsistent with an accident in the home, and that the manner of death was homicide.

Keller testified at trial and admitted that he "teased" Powell, acknowledged the searches on his phone regarding the pressure needed to fracture a human skull, and admitted that the marijuana and scales were his. He also testified that he suffered from post-traumatic stress disorder (PTSD), that he took medications for that condition, that he was not supposed to drink alcohol or use marijuana while taking the medications, and that on the night of

the incident he was not sleeping and was drinking alcohol and smoking marijuana.

Although Keller has not challenged the sufficiency of the evidence to support his convictions, as is this Court's practice in murder cases, we have reviewed the record and conclude that the evidence presented at trial and summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Keller was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. In his first three enumerations of error, Keller alleges that his trial counsel was ineffective in various respects. To prevail, Keller must demonstrate both that the performance of his lawyer was professionally deficient and that he was prejudiced by this deficient performance. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). If an appellant fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810,

816 (IV) (814 SE2d 718) (2018).

To prove deficient performance, Keller must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." (Citation omitted.) *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). And to prove prejudice, Keller "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden is a heavy one," *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019) (citation omitted), and we conclude that Keller has not met it.

(a) Keller initially contends that the appropriate standard of review should be a "structural error" analysis rather than the familiar *Strickland* standard prescribed by the United States Supreme Court, so as to avoid the necessity of showing that trial counsel's deficient performance prejudiced his defense. While a

meritorious claim of structural error does not require a showing of prejudice, this Court has declined to presume prejudice in the context of an ineffective assistance of counsel claim based on attorney performance:

> We cannot hold that attorney error . . . is so likely to result in prejudice that we will presume it, unless we are willing to defy the Supreme Court's specific admonition that when it comes to deciding ineffective assistance claims: "Attorney errors cannot be classified according to likelihood of causing prejudice." *Strickland*, [466 U. S.] at 693. We cannot dispense with the prejudice requirement for attorney error of this type without defying the Supreme Court's clear holding that except in three limited circumstances, which are not present here, a defendant must show that any error his counsel committed "actually had an adverse effect on the defense." That means he must prove a reasonable probability of a different result.

(Citations and punctuation omitted.) *Reid v. State*, 286 Ga. 484, 488 (3) (c) (690 SE2d 177) (2010).

Keller alternatively asserts that his ineffective assistance of counsel claims should be evaluated under a "plain error" standard. But in Georgia, plain error review is limited to the sentencing phase of a trial resulting in the death penalty, a trial judge's expression of

opinion in violation of OCGA § 17-8-57, and a jury charge affecting substantial rights of the parties as provided under OCGA § 17-8-58 (b), [and, f]or cases tried after January 1, 2013, with regard to rulings on evidence, a court is allowed to consider plain errors affecting substantial rights although such errors were not brought to the attention of the court. OCGA § 24-1-103 (d).

(Citations and punctuation omitted.) *Ross v. State*, 296 Ga. 636, 639 (2) n.6 (769 SE2d 43) (2015). This Court has declined to extend plain error analysis to other claims of error in the absence of a specific provision by the General Assembly. See id.; *Gates v. State*, 298 Ga. 324, 328-329 (4) (781 SE2d 772) (2016).

(b) Keller alleges that his trial counsel was ineffective because she was unprepared for trial, citing three instances. But Keller has not shown either deficiency or prejudice. First, Keller asserts that trial counsel failed to review the recorded jail call from Keller to Ashley before trial and that had counsel done so, she could have filed a timely motion to suppress and could have timely called Dr. Arthur

France as a witness regarding Keller's post-traumatic stress disorder. But Keller has not shown that he would have prevailed on a motion to suppress, because it is well established that there is no reasonable expectation of privacy in a recorded telephone call made from a jail or prison. See *Preston v. State*, 282 Ga. 210, 213-214 (4) (647 SE2d 260) (2007). "[T]he failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel." (Citation omitted.) *Hampton v. State*, 295 Ga. 665, 670 (2) (763 SE2d 467) (2014). Moreover, Keller made no proffer of Dr. France's testimony at the hearing on his motion for new trial and therefore cannot demonstrate prejudice from the absence of Dr. France as a witness at trial. See *Price v. State*, 305 Ga. 608, 614 (4) (825 SE2d 178) (2019) ("Without having made such an evidentiary showing at the hearing, Appellant cannot demonstrate prejudice on his claim that counsel was ineffective. (Citations omitted.)").

Second, Keller asserts that had counsel reviewed discovery with him, she would have known about his PTSD and could have given adequate notice of Dr. France, and also could have offered

evidence of other instances of injuries to Powell. But, without a proffer of Dr. France's testimony, Keller cannot demonstrate prejudice. See *Price*, 305 Ga. at 614 (4). And Keller has not shown how Powell's minor injuries three weeks before the fatal incident, from which Powell had admittedly recovered, could be relevant in light of the overwhelming evidence at trial of fatal head injuries resulting from recent, multiple severe impacts incompatible with accidental injury.

Third, Keller contends that, had trial counsel properly authenticated medical records from Columbus Regional Medical Center, she would have been able to present them as exculpatory evidence, arguing that because the Columbus records showed no skull fracture, that injury must have occurred during Powell's transport to Scottish Rite. But the underlying premise is without merit. Dr. Bryant testified at trial that the Columbus CT scan was re-examined at Scottish Rite and showed the skull fracture. Moreover, an addendum to the Columbus CT scan report was prepared by the attending physician in Columbus, noting that

"[t]here is fracture of occipital bone on right."[2] Keller also contends that trial counsel should have authenticated records from St. Francis Hospital, which treated Powell three weeks before his fatal injury for what the mother described as a "rash" but the treating physician believed to be a bruise near Powell's eye. However, Keller's assertion that a prior head injury could have been shown by medical records from St. Francis three weeks earlier is unavailing because of the overwhelming evidence that Powell's death resulted from recent, multiple severe head injuries incompatible with accidental injury. Keller therefore cannot show that counsel's failure to authenticate the Columbus Regional and St. Francis medical records prejudiced him.

(c) Keller also alleges that his trial counsel was deficient in failing to timely move to suppress data from his cell phone, contending that the search was warrantless and that "it is reasonably foreseeable that the trial judge would not admit cell

---

[2] These medical records were identified as a defense exhibit at trial, though not admitted, and they were identified and testified to by Keller's trial counsel at the hearing on Keller's motion for new trial.

phone searches without a search warrant allowing the reasonable assumption the outcome of the trial would have been different." While the search and extraction of the cell phone data were made pursuant to a warrant, and the warrant and supporting affidavit were produced at trial, Keller contends that the warrant was constitutionally inadequate for lack of particularity. Keller asserts that the search was therefore *in effect* warrantless, citing *Groh v. Ramirez*, 540 U. S. 551, 557 (II) (124 SCt 1284, 157 LE2d 1068) (2004), and *Bryant v. State*, 301 Ga. 617, 619-620 (2) (800 SE2d 537) (2017). But even a search based upon a defective warrant is not a *warrantless* search. Moreover, in both of those decisions, "the warrant . . . did not simply omit a few items from a list of many to be seized, or misdescribe a few of several items. The warrant did not describe the items to be seized *at all*." (Citation and punctuation omitted; emphasis in original.) *Bryant*, 301 Ga. at 620. See also *Groh*, 540 U. S. at 554-555 (I).

Here, by contrast, the warrant described the particular cell phone and its contents to be searched, "to include telephone logs

showing phone numbers and date stamps for account accesses, and the contents of private data, text message data in the user's inbox, sent and received text messages and trash folders, video files, [and] picture files." See generally *Leili v. State*, 307 Ga. 339, 344 (2) (a) (834 SE2d 847) (2019) (magistrate authorized to make "practical, common-sense determination" that electronic equipment may have preserved evidence of relevant crimes, "though officers could not articulate exactly where those files would be found"). Keller's trial counsel cannot be found deficient for failing to file a meritless motion to suppress this evidence. See *Hampton*, 295 Ga. at 670 (2). Moreover, even assuming that the motion would have been granted, Keller "cannot show a reasonable probability that the outcome of his trial would have been different had the text messages not been in evidence." Id. The other evidence against Keller was very strong, including his conduct after Powell's fatal injury, his inculpatory statements to Ashley and Mullen, his multiple inconsistent accounts of how and where the injuries occurred, the testimony that he was the only person awake in the half hour between when Powell was

observed behaving normally and when Powell sustained multiple, fatal injuries, and his presence in Powell's bedroom at that time. Consequently, Keller cannot carry his burden of proving either deficiency or prejudice in order to show ineffective assistance of his trial counsel.

(d) Keller asserts that his trial counsel was ineffective in failing to object to the admission of the picture book containing T. K.'s narrative of the events on the evening of the murder on the ground that the contents of the book were testimonial in nature and barred by *Crawford v. Washington*, 541 U. S. 36, 68 (124 SCt. 1354, 158 LE2d 177) (2004), even though T. K. testified at trial. Keller contends that because the counselor who helped T. K. prepare the book did not testify at trial, *Crawford* is implicated because Keller could not cross-examine the counselor to determine the extent to which she actually wrote or suggested its contents. However, at the hearing on Keller's motion for new trial, trial counsel was never asked, and never stated, why she did not object to the book being admitted into evidence. In the absence of testimony from trial

counsel regarding her reasons for not objecting, "it is extremely difficult to overcome the presumption that [her] conduct was reasonable." (Citations and punctuation omitted.) *Brown v. State*, 303 Ga. 617, 621 (2) (b) (814 SE2d 364) (2018).

Moreover, T. K. testified at trial and was cross-examined; T. K. testified to many, if not all, of the same facts recounted in the book; and a recording of a forensic interview she gave in Columbus also contained substantially similar facts. As we have previously explained, "[t]he failure of trial counsel to object to such cumulative evidence does not support a claim of ineffective assistance of counsel." (Citations and punctuation omitted.) *Haney v. State*, 305 Ga. 785, 790 (2) (827 SE2d 843) (2019).

(e) Finally, the cumulative prejudice from any assumed deficiencies discussed in Divisions 2 (b), (c), and (d) is insufficient to show a reasonable probability that the results of the proceeding would have been different in the absence of the alleged deficiencies. See *Jones v. State*, 305 Ga. 750, 757 (4) (e) (827 SE2d 879) (2019). Accordingly, Keller is not entitled to relief under this theory.

3. Keller contends the trial court erred in denying his pretrial motion for a continuance. This contention is without merit.

OCGA § 17-8-22 provides in pertinent part: "All applications for continuances are addressed to the sound legal discretion of the court and, if not expressly provided for, shall be granted or refused as the ends of justice may require. . . ." And "[a] refusal to grant a continuance will not be disturbed by appellate courts unless it clearly appears that the judge abused his discretion in this regard." (Citations and punctuation omitted.) *Lane v. State*, 299 Ga. 791, 794 (2) (792 SE2d 378) (2016).

Here, Keller's trial counsel appeared at a calendar call on December 5, 2016, and stated that she needed a continuance in order to retain an expert to review the medical records in the case. The case was then placed on the trial calendar for January 3, 2017, but was continued. The case was continued again from the February 2017 trial calendar because Keller's counsel was in trial in another county. On February 10, the trial court sent counsel a letter specially setting the case for trial on March 27, 2017.

On March 17, Keller's trial counsel transmitted a request for continuance via e-mail, stating that she had filed a motion for continuance on March 7. The trial court responded on March 21 with a letter noting that no motion had been filed with the clerk of court, that the case had been specially set on February 10, and that counsel had had over a month to prepare, and ordered her to appear ready to select a jury at 9:00 a.m. on March 27. Keller's motion for continuance was eventually filed on March 23.

On March 27, Keller's case was called for trial. The State announced that it was ready to proceed, but Keller's trial counsel stated that she was not ready and urged the court to grant her motion for continuance, contending that she had not received certain medical records from the State until "I believe it was in late October." She acknowledged that she had possessed the discovery for at least six months, but claimed she had been unable to obtain a medical expert to review it. She contended that she had been "working diligently trying to find a medical expert," and added that she would be ineffective if forced to proceed. In response, the State

noted that the case already had been continued twice at the last minute and that the State had "exhausted [its] entire witness fund" paying airfare for multiple witnesses to come to Columbus, only to be sent home because the case had been continued.

The trial court noted that the case had been on the trial docket since August 2016 and that "the defendant ha[d] had more than a month to retain any expert that they deem necessary for the defense in the case and otherwise prepare the case for trial," and denied the motion. Under these circumstances, we cannot say that the trial court abused its broad discretion in denying yet another defense motion for a continuance. See *Lane*, 299 Ga. at 794 (2).[3]

4. Next, Keller contends the trial court erred in denying his motion for mistrial after it was discovered that the State never provided him with a copy of one of the search warrants. We disagree.

When the State offered into evidence reports from Keller's cell phone, Keller objected that the State had not provided the search

---

[3] We note that Keller does not claim ineffectiveness of trial counsel in this instance.

warrant for the phone data to him in discovery. The State responded that, while it could not verify that the warrant was provided without reviewing the voluminous case file, it had provided its entire file to the defense. The trial court overruled the objection and admitted the reports into evidence. At the lunch break, the prosecutor reported that the search warrant was not in the State's file or in the custody of law enforcement, but that he was able to locate the original in the chambers of the superior court judge who signed the warrant and obtained a copy. The warrant was then admitted into evidence without objection.

The following day, after the State concluded its presentation of evidence and rested its case and the defense began presenting its case, Keller moved for a mistrial on the basis that the State had failed to provide the warrant, contending it had been in the custody of the police and that the State had misrepresented to the trial court that copies of the warrant had been provided in discovery. The trial court excused the jury, heard argument, and denied the motion, declining to rely upon where the warrant was eventually located,

but noting that the discovery provided by the State clearly referenced the existence of a warrant.

"[I]f the defendant did not make a contemporaneous motion for a mistrial at the time the defendant became aware of the matter giving rise to the motion, then the defendant has waived review of this issue on appeal." (Citations and punctuation omitted.) *Coley v. State*, 305 Ga. 658, 661 (3) (827 SE2d 241) (2019). Because Keller waited to move for a mistrial until well into the next day's proceedings, and after the warrant had been admitted into evidence without objection, this issue is not properly before this Court for review. Id. at 662 (3).

5. Keller next contends that the trial court abused its discretion in refusing to allow Dr. France to testify that Keller had PTSD, on the basis that Keller did not disclose him as an expert witness in a timely fashion.

> [U]nder the reciprocal discovery rules, a defendant's attorney must furnish opposing counsel with information on defense witnesses no later than five days prior to trial. OCGA § 17-16-8 (a). Otherwise, the trial court may, upon a showing of prejudice and bad faith, prohibit the

defendant from introducing the evidence not disclosed. OCGA § 17-16-6.

(Punctuation omitted.) *Hudson v. State*, 284 Ga. 595, 596-597 (3) (669 SE2d 94) (2008).

Keller called Dr. France as a witness on the fifth day of trial. The State objected on the basis that Keller had not provided the State with the required notice or a summary of Dr. France's testimony. In the ensuing colloquy, trial counsel acknowledged that she knew about Dr. France three days earlier but did not provide his name to the State or file a witness list until the day that she called Dr. France as a witness. Moreover, the State had no opportunity to review Dr. France's proposed testimony or prepare for cross-examination. Thus, the trial court did not abuse its discretion in excluding Dr. France's testimony. See *Hudson*, 284 Ga. at 597 (3); see also *Jones v. State*, 292 Ga. 593, 597 (4) (740 SE2d 147) (2013) (holding trial court authorized to find bad faith when appellant failed to notify State as soon as he knew witness might appear and authorized to find State was prejudiced by surprise witness because

State had rested its case and prosecutor had insufficient time to interview witness or prepare).

As we have already noted, without a proffer of Dr. France's testimony, Keller cannot demonstrate prejudice. See *Price*, 305 Ga. at 614 (4). Moreover, Keller testified on his own behalf at trial and informed the jury of his PTSD diagnosis and its effects on his personality and memory. In light of this, and in light of the strong evidence of Keller's guilt, "the exclusion of [the witness'] testimony was harmless error, if error at all," as it was "highly probable that the exclusion of this evidence did not contribute to the jury's verdict." (Citation omitted.) *Carter v. State*, 285 Ga. 394, 398 (6) (677 SE2d 71) (2009).

6. In his next enumeration of error, Keller contends the trial court erred in admitting evidence regarding the testing of the marijuana discovered in Keller's home. The officer who initially tested the marijuana and prepared the report was under subpoena, but he had retired, apparently was unaware of the trial, and was out of town during the week of the trial. Rather than ask for a

continuance, the State requested that another officer retest the marijuana and prepare a new report. The State provided a copy of the new report to Keller and offered to make the officer who prepared the new report available for trial counsel to interview. Keller objected to the witness and the report because he had not been given notice at least ten days before trial.

OCGA § 17-16-6 provides that, upon the State's failure to comply with discovery requirements,

> . . . the court may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances. . . .

This Code section grants the trial court a broad discretion to fashion a remedy appropriate under the circumstances. See *Cushenberry v. State*, 300 Ga. 190, 194 (2) (a) (794 SE2d 165) (2016).

Here, Keller has not shown that the trial court abused its discretion in allowing this remedy for the absence of the original officer. Nor has Keller shown prejudice, see *Cushenberry*, 300 Ga. at

194-195 (2) (a), because the re-testing produced the same result, and Keller admitted at trial that he smoked marijuana, that the substance found by police in his house was marijuana, and that it belonged to him. This enumeration of error is without merit.

7. Keller contends the trial court erred in refusing to sever the burglary and drug charges as counts unrelated to the murder and child cruelty charges. We disagree.

On the first day of trial, Keller orally moved to sever the burglary count because he had "an interest in resolving that matter," and because it was bad character evidence and "a completely unrelated case." The State responded that the conflict between Keller and the neighbors giving rise to the burglary charge occurred shortly before the murder, and that it was relevant to show Keller's agitated state at the time. The trial court denied the motion. The drug-related charges were not part of Keller's motion, and Keller did not raise the issue of severance of those charges until the motion for new trial. That issue is therefore not preserved for appellate review. See *Harris v. State*, 304 Ga. 276, 279 (2) (818 SE2d

530) (2018) ("Because [appellant] did not raise this claim below, and because he is not challenging an evidentiary ruling by the trial court [or a jury instruction], this error is not preserved for appellate review." (Citations omitted.)).

With respect to the burglary charge,

[t]wo or more offenses may be joined in one charge, with each offense stated in a separate count, when the offenses, whether felonies or misdemeanors or both: (a) are of the same or similar character, even if not part of a single scheme or plan; or (b) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

Further, when two or more offenses are joined on grounds that they are of the same or similar character, and are part of a single scheme or plan, or are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, the trial court, in its discretion, should grant a severance of offenses if it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each charge; in this regard, the question for decision is whether, in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

(Citations and punctuation omitted.) *Harrell v. State*, 297 Ga. 884, 889 (2) (778 SE2d 196) (2015).

Here, the crimes all occurred very closely in time and were a "series of acts connected together" which the State used to demonstrate that Keller, already upset by the loss of his job and his car and a custody dispute with his second wife, became more and more agitated, precipitating the conflict with the neighbors over his entering their vehicle and attempting to enter another, and ultimately leading to the death of the victim. Based on these facts, we cannot say the trial court abused its discretion in denying Keller's motion to sever. See *Griffin v. State*, 292 Ga. 321, 323 (3) (737 SE2d 682) (2013).

8. Keller asserts that the trial court erred in allowing evidence of his argument with Ashley over his treatment of Powell on the afternoon before the murder, during which he kicked and damaged a door. He contends that it only showed bad character, was unrelated to motive, and violated OCGA § 24-4-404 (b).

"We review a trial court's evidentiary rulings under an abuse of discretion standard of review. And even where an abuse of discretion is shown, there are no grounds for reversal if the error did

not affect a substantial right, and thus harm, the defendant." (Citations and punctuation omitted.) *Venturino v. State*, 306 Ga. 391, 393 (2) (830 SE2d 110) (2019).

The requirements of OCGA § 24-4-404 (b) do not apply to "intrinsic evidence," which is an uncharged act arising from the same transaction or series of transactions as the charged offense, necessary to complete the story of the crime, or "inextricably intertwined" with the evidence of the charged offense. *Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017).

> [E]vidence of other acts is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

(Citations and punctuation omitted.) Id. at 486 (IV) (d). Keller's behavior a few hours before he inflicted Powell's fatal injuries — arguing with Ashley regarding his treatment of the murder victim and resorting to physical violence — "plainly pertained to the chain of events in the case and was linked by time and circumstance with

the charged crimes, making the information necessary to complete the story for the jury." Id. The trial court did not abuse its discretion in admitting this evidence.

9. Keller contends the trial court erred in allowing redacted copies of his text messages and internet searches to go out with the jury in deliberations, contending they violated the "continuing witness" rule. We disagree.

> In Georgia, the continuing witness objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once. The types of documents that have been held subject to the rule include affidavits, depositions, written confessions, statements, and dying declarations.

(Citations and punctuation omitted.) *Davis v. State*, 285 Ga. 343, 348 (8) (676 SE2d 215) (2009).[4] Here, the text messages were "not the reduction to writing of an oral statement, nor . . . a written

---

[4] "As noted in Paul S. Milich, Georgia Rules of Evidence § 19:8, at 750 (2014-2015 ed.), . . . the continuing witness rule itself was unaffected by the enactment of the new Evidence Code." *Rainwater v. State*, 300 Ga. 800, 802 (2) n.3 (797 SE2d 889) (2017).

statement provided in lieu of testimony. Instead, [they were] original documentary evidence." (Citation omitted.) *Young v. State*, 292 Ga. 443, 446 (3) (b) (738 SE2d 575) (2013). "[T]he challenged exhibits were not written testimony and did not derive their evidentiary value solely from the credibility of their makers. Instead, they were original documentary evidence, and were properly allowed to go out with the jury." (Citations omitted.) *Davis*, 285 Ga. at 348 (8) (exhibits including letters). See also *Nix v. State*, 354 Ga. App. 47 (__ SE2d __) (2020) (text messages are original documentary evidence).

10. Finally, Keller contends that the trial court was biased against him and not fair and impartial. He bases this contention on the court's alleged animus toward his trial counsel, evidenced by the court admonishing trial counsel for being repeatedly late to court and informing the jury on one occasion that the trial had been delayed because of counsel, as well as rulings made during the trial. Keller, however, has failed to preserve this enumeration of error for review, as he raises it for the first time on appeal.

Despite Keller's contention that the trial court's bias did not become apparent until after the hearing on the motion for new trial, the acts of which Keller complains all occurred during the trial. But Keller did not object to the alleged bias and did not move for recusal of the judge during the trial, and he did not allege bias in his motion for new trial or his amended motion for new trial. At the hearing on Keller's motion for new trial, on January 16, 2019, trial counsel for the first time testified that the judge went "off on" her and "[t]hat was kind of the pattern of the trial," that there was "a lot of tension," and that it affected her performance. While Keller also references the trial court's statements and comments during a later hearing, after which his lawyer was found in contempt of court, that hearing occurred in July 2017, several months after Keller's trial and well before the filing of Keller's amended motion for new trial.

When a party learns of potential grounds for disqualification of a trial judge, he must promptly move to recuse or the issue of disqualification is not preserved for appellate review.

As we have explained, to hold otherwise would be to

sanction gamesmanship. Moreover, the requirement that a motion to recuse be filed promptly is intended to promote judicial economy, that is, to ensure that "long and costly proceedings" before a disqualified judge are avoided. The idea that a party could allow a judge whom the party believes to be disqualified to continue to preside over the case without objection, only later to urge the disqualification, is inconsistent with the principles of fair play and judicial economy that are embodied in the requirement that a motion to recuse be filed promptly.

(Citations and punctuation omitted.) *Pyatt v. State*, 298 Ga. 742, 749-750 (5) (784 SE2d 759) (2016). See also Uniform Superior Court Rule 25.1 (requiring recusal motion and accompanying affidavits to be filed within five days). Keller raised these contentions for the first time on appeal and therefore has failed to preserve any claim regarding the alleged bias of the trial judge for appellate review. See Pyatt, 298 Ga. at 749-750 (5)

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 20, 2020.
Murder. Muscogee Superior Court. Before Judge Mullins.
*Kathryn E. Rhodes*, for appellant.
*Julia F. Slater, District Attorney, George E. Lipscomb II, Assistant District Attorney; Christopher M. Carr, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.