**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 17, 2026

S25A1111. DEMPSEY v. THE STATE.

LaGrua, Justice.

Appellant Le'Quan Dempsey appeals his convictions for felony murder and other crimes related to the shooting deaths of John Pendrak and Aiden Reynolds.[1] On appeal, Dempsey argues that his convictions should be reversed because (1) the evidence was legally insufficient to support the verdicts, and (2) the trial court abused its

---

[1] Pendrak and Reynolds were killed on July 21, 2022. On November 16, 2022, a Gwinnett County grand jury indicted Dempsey for the following counts: felony murder predicated on aggravated assault (Counts 1 and 2); felony murder predicated on armed robbery (Counts 3 and 4); aggravated assault (Counts 5 and 6); armed robbery (Counts 7 and 8); and possession of a firearm during the commission of a felony (Counts 9 and 10). Dempsey was tried from April 10 to 24, 2023, and the jury found Dempsey guilty on all counts. The trial court sentenced Dempsey to life without the possibility of parole on Counts 3 and 4, to run concurrently; five years in confinement on Count 9, to run consecutively to Count 3; and five years in confinement on Count 10, to run consecutively to Count 9. The remaining counts merged or were vacated by operation of law. Dempsey filed a timely motion for new trial, which he later amended through new counsel on October 28, 2024. After holding a hearing on the motion, the trial court denied it on April 15, 2025. Dempsey filed a timely notice of appeal to this Court, and the case was docketed in this Court to the August 2025 term and submitted for a decision on the briefs.

discretion by admitting evidence that Dempsey was on probation at the time of the incident. For the reasons set forth below, we reject Dempsey's arguments. Accordingly, we affirm.

The evidence presented at trial showed that, during the early morning hours of July 21, 2022, Pendrak and Reynolds were shot and killed at Sunset Park in the Norris Lake neighborhood of Gwinnett County. Prior to that night, on July 19, Reynolds received a message on Instagram from an Instagram account—later determined to be Dempsey's—asking if he had marijuana for sale. Reynolds responded that he did not know the Instagram user who was contacting him, and the user indicated that he got Reynolds's name from a person at "the lake" because the user was "trying to shop." Throughout July 19 and 20, the user of Dempsey's Instagram account and Reynolds exchanged multiple Instagram messages and conducted Instagram video calls concerning the proposed drug deal.

On July 20, Reynolds called Pendrak and told Pendrak that he "had a play," and Pendrak's girlfriend, Kayla Black, overheard the conversation. Black heard Reynolds tell Pendrak that he "had

somebody that wanted four pounds [of marijuana] for $200." Black told Pendrak that he was "crazy" and the deal "didn't sound right" because four pounds of marijuana was worth much more than $200. Additionally, according to Black, Pendrak only possessed two and a half ounces of marijuana at the time. Later that night, Black overheard Reynolds on an Instagram video call talking to someone about the drug deal, and in the background, Black heard another person talking.

On the night of July 20, Black, Reynolds, and Pendrak drove in Reynolds's car to Sunset Park, which was the location proposed via a message from the user of Dempsey's Instagram account. Black testified that Pendrak and Reynolds did not communicate with anyone other than the user of Dempsey's Instagram account regarding their plan to go to the park that night. Black, Reynolds, and Pendrak arrived at the park at approximately 12:00 a.m. on July 21, and they sat in the car and waited. At 12:25 a.m., the user of Dempsey's Instagram account messaged Reynolds saying, "Here."

Surveillance videos from a nearby house[2] showed that, at 12:26 a.m., Reynolds flashed his car's lights; Pendrak and Reynolds got out of the car; and another person appeared near the park entrance. Pendrak was wearing a backpack, and Black testified that Pendrak had marijuana in his possession. Black stayed in the car, and she saw someone "walking down the hill" to meet Pendrak and Reynolds in the park.

Black then put her head down and fell asleep. She woke up to the sound of gunshots, and she looked for Reynolds and Pendrak but did not see them. Black then saw two people wearing all black, and she testified that "one was a taller more slimmer build," and the other "was a little shorter, but more thick." Black testified that she saw the person with the "bigger body, the wide body" tuck a gun into his or her waistband. Black then saw someone from one of the nearby houses come outside, and the two people from the park looked in that direction and "turned around and ran off." After they

---

[2] These surveillance videos were admitted by stipulation of the parties and played for the jury at trial.

4

ran off, Black got out of the car and approached Reynolds and Pendrak, who were lying on the ground, and she attempted to render aid. Black then called 911.

After Black called 911, Gwinnett County Police Officer Johnny Norman arrived at the park, where he found the bodies of Pendrak and Reynolds and secured the scene.[3] At the scene, investigators recovered multiple 9mm cartridge casings, all of which were fired from the same firearm. Additionally, investigators recovered a BB gun, which was tucked into the waistband of Pendrak's pants, but they did not recover any firearms at the scene. The backpack that Pendrak was carrying when he arrived at the park was missing.

Gwinnett County Police Corporal William Webb also responded to the scene with his assigned patrol canine, and Corporal Webb was informed that the suspects ran towards a retaining wall across the street from the park. Corporal Webb and his canine started tracking near the retaining wall, and while they were

---

[3] The cause of death for Reynolds was multiple gunshot wounds to the head, back, and right lower extremity. The cause of death for Pendrak was multiple gunshot wounds to the back and the left upper extremity.

tracking, a witness approached Corporal Webb and said that she saw a male in all black running up a nearby street. Corporal Webb and his canine proceeded in that direction, and the canine tracked to a house on Amy Road. Corporal Webb and other officers attempted to do a "knock and talk," but nobody answered the door.

Around 2:30 a.m., Gwinnett County Police Sergeant Brian Pierson, the lead detective in the case, arrived on scene and spoke to Black. Black told Sergeant Pierson that Reynolds had messaged someone on Instagram regarding a drug deal, and Black provided Reynolds's Instagram account name to Sergeant Pierson. Sergeant Pierson secured a search warrant for the information on Reynolds's Instagram account and found a conversation pertaining to a drug deal between Reynolds and an Instagram user, "popshots_ej." During his investigation, Sergeant Pierson learned through two witnesses, Madison Miller and McKenzie Brown, that the "popshots_ej" Instagram account belonged to someone they knew as "EJ." Brown also told Sergeant Pierson that she went to high school with "EJ" and "did his hair" at the Amy Road house about a week

before the murders.

Sergeant Pierson then obtained information from school officials that Dempsey goes by "EJ," and that another student, Kejuan Davis, lived at the Amy Road house. After acquiring Dempsey's name and date of birth from school officials, Sergeant Pierson learned that Dempsey was on probation, and Sergeant Pierson "talked to [Dempsey's] probation officer." On August 5, Sergeant Pierson went to the Amy Road house, which is a little over 1,000 feet from Sunset Park, where he spoke to two witnesses who confirmed that Dempsey had recently been at the house.

On August 10, Sergeant Pierson interviewed Dempsey, who was 16 at the time, at his home with his grandmother present. During the interview, Dempsey gave his cell phone to Sergeant Pierson. On August 15, after reading Dempsey the "Advice of Rights to Juveniles" form,[4] Sergeant Pierson interviewed Dempsey again in the presence of his grandmother at police headquarters.

---

[4] See *Miranda v. Arizona*, 384 US 436 (1966); *Fare v. Michael C.*, 442 US 707 (1979); *Clark v. State*, 315 Ga. 423 (2023).

Throughout these interviews, Dempsey asserted that he was at home in Avondale Estates during the time of the murders.

However, Dempsey's explanations evolved as investigators confronted him in the interviews. Specifically, Dempsey made the following claims: (1) he deleted his "Instagram" prior to the murders because he was on "probation," and "they" said that he needed to stay away from "negative, like, activities and stuff;" (2) he had not been at the Amy Road house for several months prior to the murders; (3) his Instagram account had recently been hacked; (4) he used his Instagram account to make voice calls and send some messages to Reynolds about the drug deal, and Davis also used Dempsey's Instagram account to send some messages;[5] (5) he did not have his phone from July 19 to 24, 2022; (6) Davis used Dempsey's phone to communicate regarding the drug deal because Davis's phone was broken at the time;[6] and (7) Amarion Johnson, an

---

[5] In his brief, Dempsey acknowledges that, viewing the evidence in the light most favorable to the verdicts, the evidence showed that his Instagram account was used to set up the drug deal.

[6] Contrary to Dempsey's assertion, Davis's cell phone records revealed that his phone was connecting to cell towers during and around the time of the

acquaintance of Davis, and Davis committed the murders.[7] Additionally, Dempsey stated that, after investigators searched the Amy Road house, Davis called Dempsey and said that investigators found a firearm inside the house.[8]

After Sergeant Pierson obtained a search warrant for the information on Dempsey's cell phone, the Gwinnett County Police Department's forensic lab completed a phone data extraction. Investigators discovered several changes made to accounts on Dempsey's phone on the day of the murders. Specifically, (1) the password for Dempsey's Apple ID email was reset; (2) the "Find My iPhone" feature on Dempsey's phone was disabled; and (3) Dempsey's "popshots_ej" Instagram account was deleted. And, on August 5, a factory reset of the phone occurred. After obtaining a search warrant for Dempsey's Instagram account, Sergeant Pierson

___

murders. Sergeant Pierson testified that Davis moved to Chicago shortly after the murders.

[7] Johnson's cell phone records showed that his phone was in Illinois around the time of the murders.

[8] Subsequent testing showed that this firearm did not match the cartridge casings found at the crime scene.

found several videos that showed Dempsey at the Amy Road house between July 17 and 20, 2022. Additionally, Dempsey's Instagram account included videos in which Dempsey was holding a Taurus 9mm handgun. Lastly, after examining Dempsey's cell phone records and the cell tower information around Sunset Park, investigators confirmed that, between July 17 and 21, 2022, Dempsey's phone was in that area and calls were made from and received by Dempsey's phone to and from Dempsey's grandmother, with whom he lived.

Investigators also obtained "geofence" information from Google for the Sunset Park area around the time of the murders but did not see Dempsey's cell phone within the geofence. However, Investigator John Wilbanks with the Gwinnett County District Attorney's Office testified that Google geofence data is not always reliable because a user will not appear within the geofence unless the user is accessing a Google account during the requested timeframe.

At trial, along with presenting the evidence detailed above, the State called Miller and Brown as witnesses. During Miller's

10

testimony, she identified Dempsey's Instagram account and stated that Dempsey was at the Amy Road house in July 2022. Miller also testified that she had seen Dempsey with a Taurus 9mm firearm and that she previously held that firearm. Additionally, Miller testified that, around 11:00 a.m. on July 21, Dempsey spoke to her via Instagram and said that he was "going to get locked up for some probation, something about his probation." Brown testified that she had seen Dempsey with a firearm, that she "did his hair" at the Amy Road house around July 14, and that Davis lived at the Amy Road house. Brown also testified that, after the murders, Miller called Brown and told Brown that Dempsey killed Reynolds and Pendrak.

1. Dempsey argues that the evidence in this case was insufficient as a matter of constitutional due process to convict him of the crimes charged. See *Jackson v. Virginia*, 443 US 307, 319 (1979). This claim fails.

(a) When evaluating a constitutional due process challenge to the sufficiency of the evidence, "the evidence presented at trial is viewed in the light most favorable to the verdicts to determine

11

whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of all the crimes of which he was convicted." *Johnson v. State*, 316 Ga. 672, 680 (2023). "In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury." *Ridley v. State*, 315 Ga. 452, 455 (2023). "The jury's verdicts will be upheld as long as some competent evidence, even if contradicted, supports each fact necessary to make out the State's case." *Copeland v. State*, 316 Ga. 452, 455 (2023).

Here, there was sufficient evidence for the jury to find Dempsey guilty of the crimes for which he was convicted. As noted above, when properly viewed in the light most favorable to the verdicts, the evidence presented at trial established the following: Dempsey communicated with Reynolds via Instagram to arrange a drug deal, and Reynolds and Pendrak did not tell anyone other than Dempsey that they would be at Sunset Park at the time that the shooting occurred. After law enforcement arrived at the crime scene,

the police canine tracked from the crime scene to the Amy Road house, where Dempsey had been prior to the murders, as shown by the videos that Dempsey posted of himself on Instagram. Dempsey's Instagram account also included videos in which he was holding a Taurus 9mm handgun. And, at the crime scene, investigators recovered 9mm cartridge casings. Additionally, Dempsey contacted Miller after the murders and said that he was going to get "locked up" for violating his probation, and Miller told Brown that Dempsey committed the murders.

Finally, the jury could infer that Dempsey lied to investigators and attempted to destroy evidence on his cell phone in order to conceal his involvement in the murders. See *Bates v. State*, 317 Ga. 809, 816 (2023) (noting that a defendant's lie to police allowed the jury to "infer that he was trying to hide his own participation" in a murder); *Nunnally v. State*, 319 Ga. 701, 708 (2024) (concluding that the evidence was sufficient where, among other things, the defendant "attempted to delete call logs with [the victim] from his phone to conceal his guilt"). Accordingly, when viewed in the light

13

most favorable to the verdicts, the evidence presented at trial was sufficient as a matter of constitutional due process to authorize a rational jury to find Dempsey guilty beyond a reasonable doubt of the crimes for which he was convicted.

(b) Dempsey also asserts that, aside from evidence that his Instagram account was used to facilitate the drug deal with Pendrak and Reynolds, the evidence in this case "was weak circumstantial evidence of guilt." To the extent that Dempsey is asserting a statutory claim under OCGA § 24-14-6, this argument also fails.

Under OCGA § 24-14-6, to support a conviction based on circumstantial evidence, "the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, "[n]ot every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis, only the reasonable ones." *Bates*, 317 Ga. at 814 (quotation marks omitted). "Whether alternative hypotheses are reasonable is usually a question for the jury, and this Court will not

14

disturb the jury's finding unless it is insufficient as a matter of law." *Drennon v. State*, 314 Ga. 854, 862 (2022) (cleaned up).

As an initial matter, Dempsey "has failed to identify any specific alternative hypothesis that, in his estimation, the State failed to disprove." *Weston v. State*, 320 Ga. 472, 474 (2024). Instead, Dempsey argues that he was not identified by any eyewitnesses or connected by any physical evidence to the scene of the murders, and that his guilt "was based substantially on evidence that his Instagram account was used to facilitate the drug deal that preceded the two deaths." But Dempsey's complaints regarding the State's evidence are unpersuasive because, "although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Rodriguez v. State*, 309 Ga. 542, 546 (2020).

We conclude that the evidence presented at trial, even if circumstantial, was sufficient to support Dempsey's convictions as a matter of Georgia statutory law. As recounted above, the evidence established, among other things, that Dempsey communicated with

Reynolds to arrange a drug deal; Reynolds and Pendrak did not tell anyone other than Dempsey that they would be at Sunset Park at the time that the murders occurred; and Dempsey told Miller in the morning hours after the murders that he was going to get "locked up" for violating his probation. Moreover, based on Dempsey's inconsistent statements to investigators and the changes made to accounts on Dempsey's phone after the murders, the jury could infer that Dempsey lied to investigators and destroyed evidence because of consciousness of guilt. See *Bates*, 317 Ga. at 816. Accordingly, because the evidence was legally sufficient to exclude every *reasonable* hypothesis other than Dempsey's guilt, this claim fails. See *Martin v. State*, 316 Ga. 154, 156 (2023) (holding that evidence was sufficient under OCGA § 24-14-6 where it showed, among other things, that the defendant arranged a meeting via text message with the victim prior to the victim's murder).

2. Dempsey also argues that the trial court abused its discretion by admitting evidence that he was on probation at the time of the murders. Before trial, the State moved to admit evidence

showing that, at the time of the murders, Dempsey was on probation for possession of a weapon inside a public school. After a pre-trial hearing, the trial court ruled that the State was permitted to present evidence showing that Dempsey was on probation when the murders occurred because such evidence was relevant, but the State was prohibited from introducing evidence about the charge for which Dempsey was on probation.

At trial, the jury heard the following evidence related to Dempsey's probation. Sergeant Pierson testified that, after learning from school officials that Dempsey goes by "EJ," Sergeant Pierson "found out [Dempsey] was on probation" and "talked to [Dempsey's] probation officer."[9] Additionally, in Dempsey's first interview with investigators, when Sergeant Pierson asked Dempsey if he had an Instagram account, Dempsey initially claimed that he had to delete his "Instagram" for his "probation." Throughout both of Dempsey's interviews with investigators, his probation status was referenced

---

[9] At trial, Sergeant Pierson did not testify about the content of that conversation.

multiple times, primarily by Dempsey and his grandmother, but the redacted interviews did not include any details concerning the charge for which he was on probation. Finally, Miller testified that, around 11:00 a.m. on the day of the murders, Dempsey said that he was going to get "locked up" for violating his probation.

On appeal, Dempsey argues that the trial court abused its discretion in admitting this probation-status evidence at trial because it was not relevant under OCGA § 24-4-401 ("Rule 401") and should have been excluded under OCGA § 24-4-403 ("Rule 403") and OCGA § 24-4-404(b) ("Rule 404(b)"). Because the probation-status evidence was both relevant and intrinsic to the crimes charged, the trial court did not abuse its discretion in admitting it, and this claim fails. See *Venturino v. State*, 306 Ga. 391, 393 (2019) ("We review a trial court's evidentiary rulings under an abuse of discretion standard of review." (quotation marks omitted)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

18

the evidence." OCGA § 24-4-401. And we have explained that evidence is admissible as intrinsic evidence, rather than extrinsic evidence subject to Rule 404(b), when it is "an uncharged act arising from the same transaction or series of transactions as the charged offense, necessary to complete the story of the crime, or inextricably intertwined with the evidence of the charged offense." *Keller v. State*, 308 Ga. 492, 505 (2020) (quotation marks omitted). In applying this test, we have said that evidence relating to "the chain of events" that explains "the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *Heade v. State*, 312 Ga. 19, 25 (2021). Moreover, "this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue." *Keller*, 308 Ga. at 505.

In this case, the evidence regarding Dempsey's probation status was properly admitted by the trial court because it was both relevant and intrinsic to the crimes charged. The evidence showed

that, when Sergeant Pierson interviewed Dempsey for the first time, Dempsey initially claimed that he deleted his "Instagram" prior to the murders because of his "probation." But investigators subsequently discovered that Dempsey's "popshots_ej" account was deleted in the early morning hours after the murders. Additionally, throughout both of Dempsey's interviews with investigators, Dempsey's description of how and why he used the "popshots_ej" Instagram account—which linked him to the murders—changed, and at one point, he even alleged that the "popshots_ej" account had been "hacked" prior to the murders. Based on these shifting explanations, the jury could infer that Dempsey actually had control of his Instagram account during the pertinent time period and that he lied about the reason for deleting it. See *Bates*, 317 Ga. at 816; *Jenkins v. State*, 313 Ga. 81, 89 (2022) ("[T]he fact of an accused's … concealment … is admissible as evidence of consciousness of guilt for the charged offense, and thus of guilt itself." (cleaned up)). In addition, the other, brief references to Dempsey's probation status—which were admitted through testimony from Sergeant Pierson and

Miller as well as Dempsey's two interviews with investigators—arose in the context of demonstrating the progression of the murder investigation. Accordingly, because the evidence regarding Dempsey's probation status was relevant and "inextricably intertwined" with the other evidence demonstrating his involvement in the murders, the evidence was properly admitted as intrinsic. See *Heade*, 312 Ga. at 25.

However, "[e]ven when evidence is intrinsic, … it must also satisfy Rule 403." *Harris v. State*, 310 Ga. 372, 377 (2020) (quotation marks omitted). "Under Rule 403, relevant evidence may nevertheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Jackson v. State*, 317 Ga. 95, 102 (2023) (quotation marks omitted). In its ruling on Dempsey's motion for a new trial, the trial court noted that "[n]o witness or party used [the probation-status evidence] to impugn [Dempsey's] character or urge the jury to consider improper matters," and the trial court concluded that "the admission of [the probation-status evidence] was proper and did not result in any

unfair prejudice." We agree. Here, the references to Dempsey's probation status were brief, and the jury was never told why Dempsey was on probation. Therefore, it is not likely that the jury convicted Dempsey solely because of his probation status. See *Coleman v. State*, 321 Ga. 476, 481 (2025) (concluding the trial court did not abuse its discretion in admitting evidence of the defendant's prior drug use where, among other things, it was "not likely that the jury improperly convicted [the defendant] based solely on evidence of her previous [drug use]"). For these reasons, the probative value of the probation-status evidence was not substantially outweighed by the danger of unfair prejudice. See *Huff v. State*, 299 Ga. 801, 805 (2016) (determining the trial court did not abuse its discretion where it found that the probative value of testimony from the defendant's probation officer was not substantially outweighed by its prejudicial effect). Accordingly, the trial court did not abuse its discretion by admitting evidence that Dempsey was on probation at the time of the murders.

*Judgment affirmed. All the Justices concur.*