308 Ga. 630
FINAL COPY

S20A0258.  CLARKE v. THE STATE.

ELLINGTON, Justice.

Following a jury trial, Rupert Clarke was convicted of the malice murder of his wife, Rosemarie Lebert-Clarke, and possession of a firearm during the commission of a felony.[1] He appeals, contending that he received ineffective assistance of counsel and

---

[1] Lebert-Clarke was shot and killed on May 2, 2015. A Gwinnett County grand jury returned an indictment on July 29, 2015, charging Clarke with malice murder (Count 1), felony murder predicated on aggravated assault against Lebert-Clarke (Count 2), aggravated assault against Lebert-Clarke (Count 3), aggravated assault against Eugene Alexander ("Alex") Clarke (Count 4), and possession of a firearm during the commission of a felony (Count 5). Following a jury trial that ended on May 20, 2016, Clarke was found guilty on Counts 1, 2, 3, and 5. By judgment entered on May 26, 2016, the trial court sentenced Clarke to life imprisonment for malice murder and five years' imprisonment for possession of a firearm during the commission of a felony predicated on malice murder, to run consecutively to the sentence on Count 1. The sentencing order indicated that the verdict on felony murder merged with the murder conviction, although the felony murder verdict was actually vacated by operation of law. *Stewart v. State*, 299 Ga. 622, 627-628 (3) (791 SE2d 61) (2016). Count 3 merged with the murder conviction. Clarke filed a motion for a new trial on May 23, 2016, which he amended on April 2, 2018. After a September 7, 2018 hearing, the court denied the motion for a new trial on January 15, 2019. Clarke filed a timely notice of appeal, and his appeal was docketed in this court to the term beginning in December 2019 and submitted for decision on the briefs.

that the trial court erred in admitting an out-of-court statement over his hearsay objection, violated the continuing witness rule by sending out with the deliberating jury printouts of text messages, and committed plain error by failing to instruct the jury that a defendant's uncorroborated confession is not alone sufficient to warrant a conviction. For the reasons set forth below, we affirm Clarke's convictions.

Viewed in the light most favorable to the verdicts,[2] the evidence showed the following. On the day Clarke shot and killed Lebert-Clarke, his wife of over 30 years, he was sitting at the dining room table paying bills when she came home from work. Lebert-Clarke had a conversation with the couple's adult son, Alex, in his bedroom upstairs and then went downstairs, planning to leave to get her hair done. Alex, who was still upstairs, heard Clarke say, "I'm done with this," and then heard gunshots. Alex ran downstairs and saw his mother lying on the floor in the living room, with Clarke standing

---

[2] See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

near her with a handgun.

Alex ran upstairs and called 911. Responding officers arrived about five minutes later, and the 911 operator instructed Alex to go outside to where the officers were waiting. Clarke then walked outside and surrendered himself to the officers. Officers entered the house then and found Lebert-Clarke lying in the living room, between the couch and the fireplace, showing no signs of life. Officers found Clarke's handgun behind the dresser in the master bedroom on the home's second floor; there was no magazine or ammunition in the gun. Officers found a ten-round-capacity magazine, which was empty, on the floor at the foot of the bed. An agent with the Georgia Bureau of Investigation collected a total of eight empty shell casings from multiple locations on the home's ground floor: two were near the dining room table; one was in the central entryway, near the entrance to the living room; one was nearby, just inside the living room; one was by the couch in the living room; three were between the victim and the fireplace. There was also an unspent round in the dining room. In the ascending stairwell

opposite the front door, there was a bullet fragment in the wall. A firearms examiner determined that the bullet found in the wall and the eight shell casings found in Clarke's home were fired by Clarke's gun.

During an autopsy, a medical examiner found six bullets in Lebert-Clarke's body. She had been shot in the back four times, once in the left arm, and once in the left leg and had fatal wounds to multiple internal organs. The firearms examiner determined that the bullets removed from Lebert-Clarke's body were fired by Clarke's gun.

Four law enforcement officers testified regarding statements Clarke made spontaneously after being arrested. A GBI agent testified that, just after Clarke surrendered, "all he was saying was that 'I'm sorry, I'm sorry, I'm sorry.'" One police officer, as he was handcuffing Clarke, heard him repeatedly say, "My life is over. I work so hard." After Clarke was transported to the police station, the officer was sitting with Clarke and heard him mumbling, "I'm sorry. I'm sorry for putting you through all of this," and saying, "Oh,

what a mess." At the police station later that evening, while being escorted to the restroom, Clarke spontaneously told another officer, "It is not as it appears. I'm a hard-working man. I know what I did was wrong. . . . My children are probably not going to want to talk to me or look up to me anymore. . . . I have been doing everything for the last 10 years and with not even help with the water bill." Clarke also told that officer that he had not been sleeping well for several nights and had only three hours of sleep the previous night. Another officer who escorted Clarke to the restroom heard him spontaneously say, "I know what I did was wrong. I know it was bad. . . . I wasn't getting any help with the bills." That officer also testified that, shortly after Clarke surrendered, the couple's son, Alex, was sitting in back of the officer's patrol car and "stated that his father had previously threatened to kill his mother over bills." Lebert-Clarke's cousin testified that, after the shooting, Clarke said to him, "well, I can't believe that I killed Rose."

Evidence regarding the nature of the relationship between Clarke and Lebert-Clarke was elicited during the testimony of two

of the couple's adult children, Alex and Ashley, Lebert-Clarke's friend, Yoonmi Hampton, and Clarke's sister, Claudette Clarke, and during Clarke's own testimony. The testimony showed that Clarke and Lebert-Clarke, who were both originally from Jamaica, married in 1984 and had three children. For approximately 20 years, both husband and wife worked and contributed their incomes to the family's finances. In 2005, the family moved to Lilburn. A few months later, Clarke observed an apparent bullet hole in the molding above the front door of the home, which caused him to fear that they were not welcome in the neighborhood. Clarke reported the incident to the police, bought a handgun, and obtained a license to carry the gun. He nearly constantly carried the gun at his waist in a fanny pack.

In 2006, Lebert-Clarke lost her job. Instead of seeking another job, she founded a non-profit company to offer tutoring services for children. She did not draw a salary from the tutoring company, and she stopped contributing to the family's finances, which Clarke resented more and more over time. In 2008, Clarke's mother died,

and he became emotionally withdrawn from family members. He developed insomnia and finally sought medical treatment in 2011, but he opted not to take the recommended medication.

In 2012, Clarke lost his job and was out of work for about three months, which increased the stress he experienced in providing for the family. Clarke and Lebert-Clarke largely stopped communicating, except through text messages, and stopped spending time together. Lebert-Clarke stopped sleeping in the marital bedroom and moved into Ashley's former bedroom. Clarke put a lock on the master bedroom door to keep his wife out. When Lebert-Clarke was home, Clarke would usually stay in the bedroom with the door locked. He testified that he did not like being around his wife because she would verbally "poke" him. Clarke wanted a divorce but wanted Lebert-Clarke to undertake getting papers drawn up, because she had more free time and "if [he] didn't work [he] didn't get paid."

The shooting occurred on May 2, 2015. Clarke testified as follows: He had not been sleeping well for several days and had slept

only three hours the night before. Lebert-Clarke came home that afternoon and went upstairs. A few minutes later, Clarke looked up from where he sat at the dining room table paying bills and saw Lebert-Clarke walking slowly down the stairs and looking at him. She asked if he wanted her to help him with the bills. He responded that he had been paying the bills without her help for ten years and what he really wanted was the divorce papers. His wife said, "You're not going to get these divorce papers until you're dead." At that moment, Clarke was "exhausted," "agitated," and "enraged," and he "just absolutely lost it." He stood up, opened the fanny pack and pulled out the gun, and fired a shot toward the stairs. Lebert-Clarke ran around the corner toward the living room. Clarke ran after her and "just kept firing." He heard Alex screaming and calling 911. "Frantic" and "distraught," Clarke ran upstairs to the master bedroom. He looked through the blinds and saw police officers outside. He went downstairs and walked outside to turn himself in.

1. Clarke does not challenge the sufficiency of the evidence. Nevertheless, as is our customary practice in murder cases, we have

independently reviewed the record and conclude that the evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that he was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Clarke contends that the trial court abused its discretion in overruling his hearsay objection to a law enforcement officer's testimony regarding Alex's out-of-court statement that Clarke had previously threatened to kill Lebert-Clarke "over bills." However, it is not necessary to consider whether the admission of this evidence was error because, pretermitting whether the statement was inadmissible hearsay,[3] we conclude that any error in admitting it was harmless.

> The new Evidence Code continues Georgia's existing harmless error doctrine for erroneous evidentiary rulings. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would

---

[3] The State did not argue that any hearsay exception applied, and the trial court did not explain its basis for overruling Clarke's objection.

expect reasonable jurors to have done so. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.

*Perez v. State*, 303 Ga. 188, 191 (2) (811 SE2d 331) (2018) (citation and punctuation omitted).

We conclude that it is highly probable that admitting the evidence did not contribute to the verdict. During closing argument, Clarke's counsel stated that Clarke was "not asking [the jury] for a pass" on the homicide. Rather, she expressly asked the jury to find Clarke guilty only of the lesser offense of voluntary manslaughter. In the context of the defense theory that Clarke "snapped" after years of frustration and resentment, the alleged threat that Clarke claims was inadmissible hearsay was largely cumulative of the abundant evidence offered by the State and elicited by the defense regarding the contentious nature of the relationship between Clarke and his wife. The glancing reference to a verbal threat reflected in Alex's out-of-court statement did not include any contextual details, such as when the threat was made relative to the homicide or

whether Alex or Lebert-Clarke viewed the statement as a serious threat. We would expect reasonable jurors in deciding whether Clarke's state of mind at the time of the shooting was consistent with malice, or was instead consistent with voluntary manslaughter,[4] to have reached the same conclusion, even without the evidence of a single verbal threat on an unspecified date, based on the much stronger evidence of Clarke's actions at the time of the shooting, such as following Lebert-Clarke from room to room as she attempted to flee and firing his gun at least eight times, hitting her six times.

---

[4] Voluntary manslaughter is the killing of another person under circumstances that would otherwise be murder when the killer

> . . . acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

OCGA § 16-5-2 (a).

> It is for the factfinder to determine whether a provocation, if any, is such a serious provocation as would be sufficient to excite a sudden, violent, and irresistible passion in a reasonable person as to reduce the offense from murder to voluntary manslaughter. And the existence of provocation does not preclude the existence of malice.

*McGuire v. State*, 307 Ga. 500, 504 (837 SE2d 339) (2019) (citations and punctuation omitted).

The weakness of the inculpatory value of the statement is indicated by the prosecutors' decision not to ask any follow up questions and not to refer to Alex's statement during closing argument. And defense counsel highlighted the weakness of the evidence during closing argument, arguing that the prosecutors deliberately chose not to ask Alex about the statement because they had reason to believe Alex would retract it. Based on these considerations, and given the strength of the State's case, we conclude that it is highly probable that the admission of Alex's statement through the officer did not contribute to the verdict. See *Tyner v. State*, 305 Ga. 326, 330-331 (3) (825 SE2d 129) (2019); *Anglin v. State*, 302 Ga. 333, 341 (6) (806 SE2d 573) (2017).

3. In a related claim of error, Clarke contends that the admission of Alex's out-of-court statement that Clarke had previously threatened to kill Lebert-Clarke "over bills" violated his rights under the Confrontation Clause of the Sixth Amendment.[5] He

---

[5] See *Johnson v. State*, 289 Ga. 22, 26 (4) (709 SE2d 217) (2011) ("The Confrontation Clause generally prohibits the admission of an out-of-court

argues that his trial counsel rendered ineffective assistance by failing to object to the evidence on that basis.

To establish ineffective assistance of counsel, a defendant must show that his trial counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different. See *Strickland v. Washington*, 466 U. S. 668, 695 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). If Clarke fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. *DeLoach v. State*, 308 Ga. __, __ (2) (840 SE2d 396) (2020).

Pretermitting whether Alex's statement was testimonial and whether he was available for cross-examination,[6] it is highly probable that the admission of Alex's statement through the officer

---

testimonial statement made by a declarant who is not available for cross-examination by the accused.") (citing *Crawford v. Washington*, 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004)).

[6] The trial transcript shows that the State had invoked the rule of sequestration and that, when the officer testified about Alex's statement, Alex had already testified and remained in the courtroom.

did not contribute to the verdict, as we explained in Division 2, supra. Consequently, Clarke failed to satisfy the prejudice prong of the *Strickland* analysis, and his ineffective assistance of counsel claim fails. See *Bradley v. State*, 283 Ga. 45, 47 (2) (656 SE2d 842) (2008).

4. Clarke contends that the trial court erred in allowing, over his objection based on the continuing witness rule, State's Exhibits 5 and 154 to be included in the evidence sent out with the jury at the commencement of its deliberations. State's Exhibit 5 consisted of a printout of text messages and associated activity data from Lebert-Clarke's cell phone. The prosecutor had the couple's son, Alex, read two groups of messages during his testimony, about ten total, that he and Lebert-Clarke exchanged. State's Exhibit 154 consisted of a printout of text messages exchanged between Clarke and Lebert-Clarke over many months. The prosecutor had an investigator read during his testimony about 20 of Clarke's messages. Clarke argues that he was harmed by State's Exhibits 5 and 154 going out with the jury because the text messages painted him as "a bitter, unlikeable,

angry, detached individual" and thereby reduced his chance of a conviction of the lesser offense of voluntary manslaughter.

In Georgia, the continuing witness objection is based on the idea that it is unfair and places undue emphasis on written testimony, which is heard by the jury when given from the witness stand, for the writing to go out with the jury to be read again during deliberations, given that oral testimony is received only once, when given from the witness stand. See *Davis v. State*, 285 Ga. 343, 348 (8) (676 SE2d 215) (2009). See also *Rainwater v. State*, 300 Ga. 800, 802 (2) n.3 (797 SE2d 889) (2017) (noting that the continuing witness rule was unaffected by the enactment of the current Evidence Code); *Clark v. State*, 296 Ga. 543, 548-549 (4) (769 SE2d 376) (2015) (noting that the continuing witness rule of Georgia law "regulates which documents or recordings go into the jury room with the jury during deliberations and which ones do not"); Paul S. Milich, Georgia Rules of Evidence § 19:8 (2019-2020 ed.).

Here, the text messages were

not the reduction to writing of an oral statement, nor a

written statement provided in lieu of testimony. Instead, they were original documentary evidence. The challenged exhibits were not written testimony and did not derive their evidentiary value solely from the credibility of their makers. Instead, they were original documentary evidence, and were properly allowed to go out with the jury.

*Keller v. State*, 308 Ga. __, __ (9) (842 SE2d 22) (2020) (citations and punctuation omitted). Accordingly, the trial court did not err in overruling Clarke's continuing witness objection. See id.

5. Clarke contends that the trial court committed plain error by failing to instruct the jury on the law that his uncorroborated confession was not, by itself, sufficient to warrant a conviction.[7]

To show plain error, [the appellant] must demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. Satisfying all four prongs of this standard is difficult, as it should be.

*Hood v. State*, 303 Ga. 420, 425-426 (2) (a) (811 SE2d 392) (2018)

---

[7] See OCGA § 17-8-58 (b); *English v. State*, 300 Ga. 471, 473 (2) (796 SE2d 258) (2017) ("[U]nder OCGA § 17-8-58 (b), appellate review for plain error is required whenever an appealing party properly asserts an error in jury instructions.") (citation and punctuation omitted).

(citations and punctuation omitted). See *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018) (The Court need not analyze all of the elements of the plain error test when the appellant fails to establish one of them.).

OCGA § 24-8-823 provides: "All admissions shall be scanned with care, and confessions of guilt shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction." Assuming without deciding that any of Clarke's out-of-court statements, or all of them collectively, amounted to a confession, Clarke cannot satisfy the third prong of the plain error test by showing that the error affected the outcome of the trial court proceedings because there was ample corroborating evidence at trial. See *English v. State*, 300 Ga. 471, 474-475 (2) (796 SE2d 258) (2017). Corroboration of Clarke's purported confession included his own behavior at the crime scene, evidence of the couple's discordant relationship, Alex's testimony, and the forensic evidence. Because corroboration was extensive, the trial court proceedings were not likely affected by the trial court's failure sua

sponte to give the jury instruction on corroboration of a defendant's confession. Id.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 4, 2020.
Murder. Gwinnett Superior Court. Before Judge Batchelor.
*Brian Steel*, for appellant.
*Daniel J. Porter, District Attorney, Lee F. Tittsworth, Samuel R. d'Entremont, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.