NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 10, 2025

S25A0063. SCOTT v. THE STATE.

WARREN, Presiding Justice.

Darrell Dexter Scott challenges his 2017 conviction for felony murder for the stomping death of Darrius Ware at Johnson State Prison. Scott contends that the evidence presented at trial was legally insufficient to support his conviction; that the trial court erred in admitting Ware's unredacted death certificate and allowing it to go back with the jury, abused its discretion in allowing the State to cross-examine him about the veracity of other witnesses, and erred in responding to a jury note with an incorrect statement of the law; and that he was denied the effective assistance of counsel at trial due to his counsel's failure to request jury instructions on the lesser offenses of voluntary manslaughter and involuntary

manslaughter. For the reasons explained below, we affirm.[1]

---

[1] Ware was killed on September 23, 2014. On December 15, 2014, a Johnson County grand jury indicted Scott in connection with Ware's death. On March 20, 2017, a Johnson County grand jury re-indicted Scott for malice murder, five counts of felony murder, and six counts of aggravated assault. At a trial from May 8 to 12, 2017, the jury found Scott guilty of one count each of felony murder and aggravated assault and acquitted him of all other charges. The trial court sentenced Scott as a recidivist to serve life in prison without the possibility of parole for felony murder; the aggravated assault count merged. Scott was represented at trial by retained counsel Franklin Hogue and Laura Hogue. On May 31, 2017, Scott filed a pro se motion for new trial. Scott later retained Laura Hogue to represent him on the motion and any appeal. On November 13, 2018, Laura Hogue filed an amended new trial motion on Scott's behalf. Two months later, on January 14, 2019, Scott filed a pro se motion to dismiss Laura Hogue as his counsel for ineffective assistance, which the trial court granted on August 28, 2019. The court directed the Office of the Public Defender for the Dublin Judicial Circuit to appoint new counsel for Scott, and on January 29, 2020, Abigail Safford, Chief Assistant Public Defender for the Dublin Judicial Circuit, filed an entry of appearance as counsel for Scott. On February 24, 2021, Safford filed a second amended motion for new trial on Scott's behalf raising a claim of ineffective assistance of trial counsel. On March 1, 2021, the court held an evidentiary hearing on Scott's new trial motion at which lead trial counsel Frank Hogue testified. On November 12, 2021, the court entered an order denying the new trial motion. On Monday, December 13, 2021, Spencer Fredericks, Assistant Public Defender for the Dublin Judicial Circuit, filed a notice of appeal on Scott's behalf.

On January 13, 2022, Patricia Glover, Clerk of the Superior Court of Johnson County, prepared an appeal index. On January 28, 2022, Glover sent the record by certified mail to this Court at our old address at 244 Washington Street SW in Atlanta. (This Court moved to our current address at 330 Capitol Avenue SE in Atlanta in early 2020.) This Court did not receive the record. More than a year later, on April 24, 2023, Safford filed a motion for out-of-time appeal on Scott's behalf. The following month, the trial court held a hearing at which Courtney Morgan, Assistant Public Defender for the Dublin Judicial Circuit, announced that Safford had conflicted out of the case. On June 12, 2023, Scott filed a pro se Motion for Appointment of Appellate Counsel, noting that Safford had not "filed any direct appeal action" on his behalf, and that his

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed as follows. In September 2014, Scott, a three-time felon, was serving the sixth year of a 20-year sentence for armed robbery at Johnson State Prison. On September 23, Scott

---

appeal had not yet been docketed in this Court, despite his having "constantly and persistently contacted [Safford]." On August 28, 2023, Glover again sent the record by certified mail to this Court, this time at the correct address. This Court received the record the next day. After reviewing the record, this Court advised Glover that some exhibits sent only on disc would have to be printed out and resubmitted. On November 21, 2023, Glover sent the exhibits by certified mail to this Court, where they were received on November 29, 2023. On January 3, 2024, the trial court entered an order denying Scott's pro se Motion for Appointment of Appellate Counsel, finding that Fredericks had filed a notice of appeal on Scott's behalf, although Scott's appeal had not yet been docketed in this Court. On January 16, 2024, Scott's appeal was docketed in this Court for the April 2024 term as Case No. S24A0551.

Scott's opening brief in this Court was due by February 5, 2024, but his counsel failed to file a brief by that date. On February 20, 2024, this Court entered an order directing Scott to file his opening brief no later than March 1 or potentially face sanctions. Scott's counsel failed to comply with that order. On April 30, 2024, this Court entered an order striking Case No. S24A0551 from our docket and remanding the case to the trial court with direction to promptly determine, among other things, whether appellate counsel abandoned Scott on appeal. On May 16, 2024, Rodrequez Burnett of the Georgia Public Defender Council's Office of Appellant Defender filed a Notice of Substitution of Counsel to represent Scott. On May 29, 2024, the trial court held a status hearing at which Safford, Fredericks, Glover, Burnett, and Dublin Judicial Circuit Public Defender Clay Tapley testified. On July 18, 2024, the court entered an order finding, among other things, that appellate counsel abandoned Scott on appeal, and the court appointed Burnett to represent Scott for his appeal. On July 19, 2024, Glover sent a supplemental record to this Court. On August 19, 2024, the case was re-docketed in this Court for the term beginning in December 2024 as Case No. S25A0063. The parties have submitted the case for decision on the briefs.

went to the prison store and picked up a box of food items that he had pre-ordered, which he then put in a bag. As he was walking back to his building, Severest Arnold, an inmate from a different building, approached and began loudly arguing with him. Ware, who lived in the same building as Scott, tried to defuse the argument. Another inmate who lived in Scott's building, Kevarius Sessions, also was present.

Brice Marshall, a maintenance engineer at the prison, approached the arguing inmates to address the situation. The inmates told Marshall that he did not have anything to worry about, and there would not be a conflict, because "they was all blood." Marshall then let Arnold, whom he perceived to be "the aggressor," through the gate leading to Arnold's building. Marshall briefly followed Scott, Ware, and Sessions as they walked along the sidewalk towards the building where they were housed. As Marshall saw it, no further action was needed, because "the one that was doing all the loud talking was separated from the three guys up on the sidewalk."

Once Scott reached his building, he went back to his second-floor cell, where other inmates saw him with Ware and another inmate. The other inmates soon heard a commotion, looked towards Scott's cell, and saw Scott dragging Ware out of the cell by his feet onto the second-floor landing. A prison guard and several inmates then saw Scott jump up and stomp Ware's head into the concrete floor. When the guard rushed to Scott's cell, Scott told him, "I didn't do it. I didn't do it. I didn't do it."

Ware was found lying face-down on the landing in a pool of blood with severe injuries to his head. Medical personnel arrived within minutes and took Ware to the prison infirmary. He was then transported to a nearby hospital, where he was pronounced dead. The GBI medical examiner who performed the autopsy on Ware's body determined that the manner of death was homicide and the cause of death was blunt-force trauma to the head. A forensic serologist at the GBI crime lab later determined that a substance on Scott's right boot was blood, which a forensic biologist matched to Ware's DNA.

At trial, Scott decided to testify on his own behalf. The defense theory was that Scott's actions were justified, because he was acting in self-defense or defense of habitation. Scott testified that as he was walking back to his building from the prison store on the day that Ware died, Arnold confronted him twice and tried to take his bag with the items from the store; that during the first incident, Arnold "swung at" him, and Ware put him in a chokehold; and that when Marshall let Arnold through the gate to Arnold's building, he overheard Arnold tell Ware to "beat that p***y's a** and beat on him." Scott further testified that he was eating ice cream when Ware entered his cell in a rage; that he told Ware multiple times to leave his cell; that Ware "swung at" him, scraping the bridge of his nose; that he had trained as a boxer, so he kept his head down during the ensuing fight with Ware; and that Ware kneed him in the thigh and hit him on the top of his head a couple of times, although Scott acknowledged that he was able to dodge most of Ware's punches and that Ware did not inflict any significant injuries on him. Scott claimed that he was afraid for his life and trying to defend himself

when he repeatedly punched Ware—including a knockout blow that caused Ware to fall face-down on the cell floor—and denied ever stomping on Ware's head. Scott also presented testimony from two inmates, Kevin Robinson and Marcus Riggs, both of whom testified that on the day of Ware's death, they heard Scott yell at someone to get out of his cell. Robinson testified further that he saw Scott drag Ware out onto the second-floor landing and then walk back into his cell. Riggs testified that he saw Scott standing on the second-floor landing in front of his cell but did not see Ware there and did not see Scott stomp on Ware's head.

Scott contends that the evidence presented at trial was not sufficient to prove beyond a reasonable doubt that he was not acting in self-defense when he killed Ware.[2] See *Jackson v. Virginia*, 443 U.S. 307, 309 (99 SCt 2781, 61 LE2d 560) (1979) ("The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt."); *Gardhigh v. State*, 309 Ga. 153,

---

[2] Although Scott argued defense of habitation at trial, he does not press that claim on appeal in this Court.

157 (844 SE2d 821) (2020) ("[A]t trial, . . . the State must disprove a defendant's claim of self-defense beyond a reasonable doubt . . . ."). To support this claim, Scott points to his own testimony that he acted in self-defense when he repeatedly punched Ware in his cell, the absence of other eyewitness testimony about what happened inside the cell, the medical examiner's testimony that the blunt-force trauma that caused Ware's death could have been inflicted in a number of ways, and the conflicting testimony from other witnesses about whether Scott stomped on Ware's head after dragging him out onto the second-floor landing.

We conclude, however, that the evidence presented at trial was sufficient as a matter of constitutional due process. A rational jury could have credited the prison guard and several inmates who testified that they saw Scott jump up and stomp Ware's head into the concrete floor after he had dragged Ware out onto the second-floor landing and discredited the inmates who testified that they did not see Scott stomp Ware. Moreover, based on the evidence presented at trial, a rational jury could have rejected Scott's

testimony that Ware attacked him in his cell and that he was defending himself when he brutally beat and stomped Ware to death. A rational jury also could have concluded that while Scott may have been defending himself during the altercation in his cell, he used excessive force when he stomped Ware's head into the concrete floor on the second-floor landing, such that a justification defense was not available to him. See *Reddick v. State*, 321 Ga. 73, 74-75 (911 SE2d 638) (2025) ("Deadly force is not justified if the degree of force used by the defendant exceeds that which a reasonable person would believe necessary to defend against the victim's unlawful actions. The use of excessive force or unlawful force while acting in self-defense is not justifiable.") (cleaned up). See also *Willerson v. State*, 312 Ga. 369, 373 (863 SE2d 50) (2021) ("Given the brutality of the attack against the victim, the extent of the victim's injuries, and the fact that [the defendant] suffered no injuries in the altercation, the evidence presented by the State was sufficient to contradict the self-defense claim."). Accordingly, Scott's challenge to the sufficiency of the evidence fails.

9

2. Scott contends that the trial court abused its discretion in admitting Ware's unredacted death certificate into evidence and in allowing it to go back with the jury during deliberations. We see no abuse of discretion in the admission of the unredacted death certificate, which was relevant and subject to an exception to the hearsay rule. And we need not decide whether the court erred in allowing the unredacted death certificate to go back with the jury. See OCGA § 24-1-2 (e) ("Except as modified by statute, the common law as expounded by Georgia courts shall continue to be applied to the admission and exclusion of evidence and to procedures at trial."); *Lopez v. State*, 318 Ga. 664, 672 n.6 (898 SE2d 441) (2024) ("The continuing witness rule regulates which documents or recordings go into the jury room with the jury during deliberations and which ones do not. . . . The continuing witness rule was unaffected by the enactment of the current Evidence Code.") (cleaned up). Even assuming without deciding that the court erred, any such error was harmless, because it is highly probable that any violation of the continuing-witness rule did not affect the jury's verdicts. See

*Sharkey v. State*, 320 Ga. 477, 483 (910 SE2d 216) (2024) ("A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict.") (cleaned up).

(a) At trial, the State sought to introduce Ware's death certificate through the testimony of the Johnson County coroner. The certificate listed Ware's "IMMEDIATE CAUSE" of death as "BLUNT FORCE TRAUMA TO HEAD." In a box labeled "DESCRIBE HOW INJURY OCCURRED," the certificate said, "ASSAULTED BY ANOTHER." In a box labeled "Approximate interval between onset and death," the certificate said, "MINUTES." Scott objected on the grounds of hearsay and relevance, arguing that the coroner was not qualified to say what the cause of death was. The trial court said that it would reserve a ruling on admissibility until the State presented the testimony of the medical examiner. The court explained that if the medical examiner verified the cause of death listed on the death certificate, the court would admit it, but if there was a discrepancy between the medical examiner's

11

conclusion and what the certificate said, the court would admit a copy of the death certificate with the cause of death redacted.

The coroner then testified that "[t]he death certificate is generated by the funeral home in charge," which "then sends it to the coroner . . . to be completed"; the funeral home fills in "[t]he top portion of the death certificate," which is for "biographical information"; and the rest of the certificate "is completed by a coroner, medical examiner, or a physician." The coroner further testified that he did not determine what the cause of Ware's death was; that the GBI crime lab called him after Ware's autopsy and gave him the cause of death to put on the death certificate; and that he then manually filled in the cause of death on the certificate.

Later in the trial, Steven Atkinson, the medical examiner who performed Ware's autopsy at the GBI crime lab, testified that "the cause of death" was "blunt force head trauma," and that "the manner of death" was "homicide," which means "a human caused the death of another human." At the conclusion of Atkinson's testimony, the State moved to admit Ware's death certificate as State's Exhibit 13.

12

Scott objected on the previously raised grounds of hearsay and relevance and added an objection based on the continuing-witness rule. The court admitted the death certificate over objection and ruled that the full, unredacted exhibit could go out with the jury during deliberations.

(b) Both parties rely on cases decided under the old Evidence Code for the proposition that a certified death certificate is admissible as prima facie evidence of the death itself and of the immediate "agency of death" but not for other purposes. See *Bryant v. State*, 270 Ga. 266, 270-271 (507 SE2d 451) (1998); *Carswell v. State*, 171 Ga. App. 455, 459 (320 SE2d 249) (1984). Those cases trace back to *King v. State*, 151 Ga. App. 762 (261 SE2d 485) (1979), which relied on a predecessor to OCGA § 31-10-26. See *King*, 151 Ga. App. at 762-763. Before the adoption of the current Evidence Code, OCGA § 31-10-26 (b) said:

> A certified copy of a vital record or any part thereof, issued in accordance with subsection (a) of this Code section, shall be considered for all purposes the same as the original and shall be prima-facie evidence of the facts stated therein, provided that the evidentiary value of a

13

certificate or record filed more than one year after the event, or a record which has been amended, shall be determined by the judicial or administrative body or official before whom the certificate is offered as evidence.

However, that language was repealed with the adoption of the current Evidence Code, and OCGA § 31-10-26 (b) now addresses a separate issue that has no bearing on this case. See Ga. L. 2011, p. 99, § 43. Thus, the parties' reliance on *King* and its progeny is misplaced.[3]

(c)    Under the current Evidence Code, the trial court properly overruled Scott's relevance and hearsay objections to the admission of Ware's death certificate. Ware's immediate cause of death, how the injuries that resulted in his death occurred, and the approximate interval between the infliction of those injuries and his death were all relevant facts in this murder prosecution. See OCGA §§ 24-4-401

---

[3] OCGA § 31-10-26 (b) now says:
The federal agency responsible for national vital statistics may be furnished such duplicates or data from the system of vital records as it may require for national statistics, provided such federal agency shares in the cost of collecting, processing, and transmitting such data and provided further that such data shall not be used for other than statistical purposes by the federal agency unless so authorized by the state registrar.

14

("[T]he term 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."), 24-4-402 ("All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules . . . ."). As for Scott's hearsay objection, the death certificate was admissible under the vital records exception to the hearsay rule. See OCGA § 24-8-803 (9) ("The following shall not be excluded by the hearsay rule, even though the declarant is available as a witness: . . . **Records of vital statistics.** Records or data compilations, in any form, of births, fetal deaths, deaths, or marriages, if the report thereof was made to a public office pursuant to requirements of law."). See also OCGA § 31-10-15 (a) ("A certificate of death for each death which occurs in this state shall be filed with the local registrar of the county in which the death occurred or the body was found within ten days after the death . . . ."). Thus, the trial court did not abuse its discretion in admitting

Ware's death certificate into evidence over Scott's relevance and hearsay objections.

(d) The parties also rely on cases decided under the old Evidence Code to support their arguments about whether the trial court violated the continuing-witness rule by allowing Ware's unredacted death certificate to go back with the jury. See *Davis v. State*, 285 Ga. 343, 348 (676 SE2d 215) (2009); *Bryant*, 270 Ga. at 271. As the State notes, we have previously said that "the continuing witness rule was unaffected by the enactment of the current Evidence Code." *Lopez v. State*, 318 Ga. 664, 672 n.6 (898 SE2d 441) (2024). Accord *Moore v. State*, 311 Ga. 506, 512 (858 SE2d 676) (2021); *Lofton v. State*, 310 Ga. 770, 786 (854 SE2d 690) (2021), disapproved on other grounds by *Outlaw v. State*, 311 Ga. 396, 401 n.5 (858 SE2d 63) (2021); *Lyons v. State*, 309 Ga. 15, 18 n.3 (843 SE2d 825) (2020); *Clarke v. State*, 308 Ga. 630, 636 (842 SE2d 863) (2020); *Keller v. State*, 308 Ga. 492, 506 n.4 (842 SE2d 22) (2020); *Rainwater v. State*, 300 Ga. 800, 802 n.3 (797 SE2d 889) (2017). But none of those cases involved a continuing-witness rule challenge to

16

sending a death certificate back with the jury. As a result, we did not consider in those cases whether and to what extent the repeal of the statutory language on which *King* and its progeny were based when the current Evidence Code was enacted may have affected the application of the continuing-witness rule to death certificates.

We need not decide those questions in this case, however, because even assuming without deciding that the trial court violated the continuing-witness rule by sending Ware's unredacted death certificate back with the jury, it is highly probable that this assumed error did not affect the jury's verdicts given the abundant evidence of Scott's guilt, which included eyewitness testimony from multiple witnesses. See *Foster v. State*, 259 Ga. 206, 207 (378 SE2d 681) (1989) (holding that statements in death certificate that the deceased was "beaten in altercation" and that the "immediate cause of death [was] 'homicide'" were merely cumulative of other evidence and thus the trial court's error in allowing the death certificate in the jury room was harmless). Accordingly, this enumeration of error presents no basis for reversal.

3. Scott claims that the trial court abused its discretion by allowing the State to cross-examine him about the veracity of other witnesses. We disagree.

(a) On cross-examination, Scott testified that he did not stomp on Ware's head. The State then asked him, "How is it that we've got multiple people that saw you stomp on his head? Is it a conspiracy?" Scott responded, "I guess." Scott insisted that he was "the victim," that he went to his cell "to avoid trouble" but "[t]rouble followed" him, that he told Ware to "get out" of his cell, and "that's the only way I had to protect myself." The State asked, "The only way you had to protect yourself is to stomp on the head of an unconscious man?" Scott replied, "I did not stomp him." The State then asked, "Again, why are these people lying about you now?" In answer, Scott repeated, "I did not stomp him."

Defense counsel objected to the State's question, "Again, why are these people lying about you now?," based on OCGA § 24-6-608

(a) and *United States v. Schmitz*, 634 F3d 1247 (11th Cir. 2011).[4]

Defense counsel argued, "That is an improper question to put to a witness and have him comment on whether he thinks other witnesses are lying or whatever he thinks. That's for the jury to decide." The State responded, "That's not what I asked. . . . I could restate my question, which was not . . . do you think they're lying, but why are they lying?"

The trial court then held a bench conference, during which the court stated, "He asked him if he knows of any reason why they would have any motivation to tell something untrue. . . . You may comment on the prior testimony." Defense counsel responded, "I don't think that ruling is correct, Your Honor." Defense counsel argued, "He's asking why would these people come in here and lie about this fact of the stomp? He's asking him this question, if

---

[4] OCGA § 24-6-608 (a) (1) says, "The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, subject to the following limitations: The evidence may refer only to character for truthfulness or untruthfulness . . . ." OCGA § 24-6-608 (b) says, "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than a conviction of a crime as provided in Code Section 24-6-609, or conduct indicative of the witness's bias toward a party may not be proved by extrinsic evidence. . . ."

another witness lied on the witness stand during the trial." The court said, "The ruling of the Court is this: He may not ask this witness if any other witnesses lied in their testimony. He may ask the witness if he has knowledge of any reason why the witness would falsely testify . . . ." Defense counsel responded, "That question that Your Honor just said was proper, I say is not proper[,] because it assumes that another witness has lied. . . . This will be reversible error if you allow it. It's directly opposite the law." The court then said, "If he had knowledge of any motivation of why someone would possibly falsely testify against him, I will let him state that relationship. . . . I will not allow him to comment on whether or not another witness has testified falsely." Defense counsel sought clarification of what the State could ask Scott, and the court responded, "If he has any knowledge of any motivation as to why someone would tell a false -- would testify falsely against him."

The bench conference ended, and the State said, "Mr. Scott, I'll ask the question again." Defense counsel immediately objected, stating, "I object. No, you won't ask the question again. He's going

to ask a different question." The court said, "The question will be restated . . . as required by the ruling of the Court." The State then asked Scott, "As we've been talking about, any differences or discrepancies or just conflicts between your testimony and other people you've heard testify, do you know of any reason that they would come in here and say those things if they're untrue?" Defense counsel again objected, stating, "I make my same objection. That's the same question." The court overruled the objection. The State asked, "Do you need me to say it again or -- ?" Scott responded, "Just -- I just -- I really don't -- I don't know why." The State said, "I'm sorry?," and Scott said, "I don't understand." The State said, "Okay. I don't have any further questions." Scott then interjected, "Well, I didn't understand the question that you asked me." The court responded, "No. That's all, Mr. Scott." The court asked defense counsel if there would be any redirect examination, and defense counsel said, "No redirect." That was the end of Scott's testimony.

(b) Scott argues that the trial court abused its discretion by allowing the State to ask him multiple times on cross-examination

21

why other witnesses were lying against him, arguing that the State's questions improperly called for testimony about the truthfulness of other witnesses. Scott further asserts that the State's "were-they-lying questions" put him "in a 'no-win' situation," where he either had to "accuse another witness of lying or undermine his . . . own version of events," which *Schmitz* held could constitute prosecutorial misconduct. *Schmitz*, 634 F3d at 1269. See also id. at 1268-1269 ("It is improper to ask a testifying defendant whether another witness is lying. . . . Such questions unfairly force defendants into choosing to either undermine their own testimony or essentially accuse another witness of being a liar.") (cleaned up).

Scott's reliance on *Schmitz* is misplaced. In *Jones v. State*, 299 Ga. 40 (785 SE2d 886) (2016), this Court held that "'it is improper to ask a testifying [witness] whether another witness is lying.'" *Jones*, 299 Ga. at 43 (alteration in original; quoting *Schmitz*, 634 F3d at 1268). Here, the State's initial question to which Scott objected—"Again, why are these people lying about you now?"—did not ask Scott to opine on whether the other witnesses lied in their testimony;

22

it instead asked Scott *why* they may be doing so. In any event, the trial court effectively sustained Scott's objection to that question by ordering the State to rephrase it following the bench conference.

Notably, however, we also held in *Jones*—again quoting *Schmitz*—that "it is often necessary to focus a witness on the differences and similarities between his testimony and that of another witness," and that "this is permissible *provided* he is not asked to testify as to the veracity of the other witness." *Jones*, 299 Ga. at 43 (emphasis added; cleaned up). That is what happened here after the court ordered the State to rephrase its question to Scott. The State asked Scott, "As we've been talking about, any differences or discrepancies or just conflicts between your testimony and other people you've heard testify, do you know of any reason that they would come in here and say those things if they're untrue?" The State's reformulated question merely asked Scott whether—if any such differences, discrepancies, or conflicts existed, and if the other witnesses' testimony were untrue—he had personal knowledge of any reason the other witnesses would come to court and say those

things. Nothing in our current Evidence Code, *Jones*, or *Schmitz* prohibits such a question. See OCGA §§ 24-6-602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of such matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony. . . ."), 24-6-622 ("The state of a witness's feelings towards the parties and the witness's relationship to the parties may always be proved for the consideration of the jury.").

Moreover, and contrary to Scott's claim, the State's reformulated question did not put Scott in the "'no-win' situation" described in *Schmitz* of choosing between either undermining his own testimony "or essentially accus[ing] another witness of being a 'liar.'" *Schmitz*, 634 F3d at 1269. See also id. ("Were-they-lying questions ignore other possible explanations for inconsistent testimony. Testimony can conflict for many reasons that do not involve a deliberate intent to deceive. There may be lapses in memory, differences in perception, or a genuine

misunderstanding. . . . Were-they-lying questions ignore all of these innocent explanations, and put the testifying defendant in a 'no-win' situation: The defendant must either accuse another witness of lying or undermine his or her own version of events.") (cleaned up). The court therefore did not abuse its discretion in overruling Scott's objection to the State's reformulated question. See *Reddick*, 321 Ga. at 87 n.9 (noting that "although the 'credibility of a witness shall be a matter to be determined by the trier of fact,' OCGA § 24-6-620, a witness's statement that does not *directly* address the credibility of another witness is not improper") (emphasis in original); *Harris v. State*, 304 Ga. 652, 657 (821 SE2d 346) (2018) (holding that, because a detective did not directly comment on a witness's veracity, the detective did not improperly comment on the credibility of the witness). Accordingly, this enumeration of error fails.

4. Scott maintains that the trial court erred by responding to a jury note with what he says was an incorrect statement of the law over his objection. For the reasons explained below, this claim fails.

The jury sent the court a note during deliberations that said: "If we, the jurors, find the defendant guilty of agg assault, do we have to charge him with felony murder?" Defense counsel argued, "The correct answer is no." The State argued, "the best response is that they should refer to the charge given to them by the Court . . . which they've got." The court stated, "I think I'm just going to say: It is up to you." Defense counsel said, "Am I wrong? The correct answer is no? Isn't that the correct answer?" The court responded, "It is, but is that suggesting an answer?" The State explained why it thought that the court's suggested answer was better, and the court said, "I'm going to say: It is up to you." Defense counsel stated, "If . . . that's the Court's ruling, we'll just place our exception to it on the record. . . . We think that the correct answer is no, and that that's the answer the Court should give." The court wrote on the jury note, "It is up to you." The court then instructed the bailiff to take the note with the court's answer back to the jury.

On appeal, Scott contends that the trial court should have responded to the jury's question with a simple "no" instead of saying,

26

"It is up to you," because while a defendant must be found guilty of the underlying felony to be found guilty of felony murder, the opposite is not true; a defendant may be found guilty of aggravated assault but not felony murder based on that aggravated assault, because felony murder requires that the underlying felony be the proximate cause of death. However, Scott cites no authority for his argument that the only legally correct answer to the jury's question was "no" and that the answer the court gave was an incorrect statement of the law. The jury had already been instructed that *if* it believed beyond a reasonable doubt that Scott committed the homicide alleged in the indictment at the time that he was engaged in the commission of the felony of aggravated assault, it would be *authorized* to find him guilty of felony murder. The jury also was given the pattern jury instruction on causation as it relates to felony murder. Thus, the jury had already been instructed on how to evaluate whether Scott was guilty of felony murder, and the court's response to the jury note—"It is up to you"—merely restated the jury's obligation that had already been conveyed to it.

27

The need for, breadth, and formulation of additional jury instructions in response to a jury note "'are left to the sound discretion of the trial court.'" *Stepp-McCommons v. State*, 309 Ga. 400, 405-406 (845 SE2d 643) (2020) (citation omitted). And although a simple "no" also would have been a legally correct answer to the jury's question, the court did not abuse its discretion by conveying a legally accurate response that was not "in the exact language requested." See *Caldwell v. State*, 317 Ga. 507, 510 (893 SE2d 708) (2023) ("The failure to give a requested jury charge in the exact language requested provides no basis for reversal where the charges, as a whole, substantially cover the applicable principles of law."). Accordingly, this enumeration of error also fails.

5. Scott contends that he was denied the effective assistance of counsel due to his counsel's failure to request jury instructions on the lesser offenses of voluntary manslaughter and involuntary manslaughter. A criminal defendant who claims that his attorney's assistance was so defective that his convictions must be reversed must prove both that the attorney's performance was professionally

28

deficient and that the deficiency resulted in prejudice to his case. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "[T]here is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

To prove deficient performance, the defendant must show that his attorney's acts or omissions were objectively unreasonable, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. The law recognizes a "strong presumption" that counsel performed reasonably, which the defendant bears the burden of overcoming. Id. at 689.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time . . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Id. at 689-690 (citations omitted).

To prove deficiency, a defendant must show that no reasonable attorney would have done what his attorney did, or would have failed to do what his attorney did not do. See *Hardy v. State*, 317 Ga. 736, 739 (893 SE2d 893) (2023). In particular, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Id. at 741 (cleaned up). "The defendant must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

In all, the burden of proving a claim of ineffective assistance of counsel is a heavy one. Scott has not carried that burden here.

Lead trial counsel Frank Hogue testified at the motion for new trial hearing that he did not recall requesting any jury instructions

on lesser offenses or discussing such options with Scott. When the State asked Hogue on cross-examination why he did not request any jury instructions on lesser offenses, he said, "I don't know. I should have." The State then elicited testimony from Hogue that he had been practicing law for 30 years and that he had requested jury instructions on lesser offenses in some self-defense cases and not requested such instructions in others. Hogue named two murder cases where the defense theory was justification by self-defense in which he did not request jury instructions on lesser offenses and said that one resulted in a hung jury, and the other resulted in a murder conviction. Hogue further testified that in the hung jury case, on retrial, he objected to the giving of a jury instruction on voluntary manslaughter, but his objection was overruled, and the jury then found his client guilty of voluntary manslaughter. Hogue confirmed that sometimes he chooses not to request jury instructions on lesser offenses as a matter of trial strategy and that he makes that call on a case-to-case basis, but he declined to say that he made such a call in Scott's case, stating, "I have no memory of considering it,

31

discussing it and then reaching that decision. I don't have any memory of doing that."

In its order denying the new trial motion, the trial court found that

> [i]n this case, . . . Mr. Hogue's decision not to request the lesser charges was a strategic decision. Mr. Hogue was aware of the option to request lesser included offenses. He chose not to request those charges, basing his strategy on self-defense.

The court determined that Hogue's strategic decision "not to request the lesser included offenses was not so deficient that no competent attorney would have made it." And the court dismissed Hogue's statement that he "should have" requested jury instructions on lesser offenses, noting that "such statement was made in hindsight."

On appeal, Scott argues that Hogue should have requested jury instructions on voluntary manslaughter and involuntary manslaughter because the "jury was clearly sympathetic to Mr. Scott's circumstances," and "would have returned a verdict as to a lesser-included charge, had they been given the option." But the point of not requesting (or objecting to) jury instructions on

voluntary manslaughter and involuntary manslaughter in a murder case is to prevent a sympathetic jury from reaching a compromise verdict of guilty on voluntary manslaughter or involuntary manslaughter as opposed to murder, when outright acquittal based on self-defense or another justification defense like defense of habitation is a possibility for the defendant. See, e.g., *Ryals v. State*, 321 Ga. 151, 162-163 (913 SE2d 604) (2025). Under the circumstances of this case, a competent trial attorney could reasonably decide that the best strategy was an all-or-nothing approach that forced the jury to make the stark choice between acquitting the already incarcerated Scott and finding him guilty of murder.

In this regard, the record supports the trial court's conclusion that Hogue indeed made a strategic decision not to request jury instructions on lesser offenses and instead to rely on self-defense alone. Hogue testified that he was familiar with the law of self-defense and had requested jury instructions on lesser offenses in other murder cases, but that he "knew [Scott's] case was a self-

33

defense case from the beginning" and had conversations with Scott about this being a self-defense case. "Decisions about which defenses to present and which jury charges to request are classic matters of trial strategy, and pursuit of an all-or-nothing defense is generally a permissible strategy." *Velasco v. State*, 306 Ga. 888, 893 (834 SE2d 21) (2019) (cleaned up). See also *Gardner v. State*, 310 Ga. 515, 519 (852 SE2d 574) (2020) ("The decision not to request a jury charge on a lesser included offense in order to pursue an all-or-nothing defense is a matter of trial strategy.") (cleaned up). See *Lopez*, 318 Ga. at 671 (concluding that trial counsel's decision to pursue an all-or-nothing defense instead of requesting jury instructions on voluntary manslaughter and involuntary manslaughter was not patently unreasonable).

Because Scott has failed to show that Hogue was professionally deficient in not requesting jury instructions on voluntary manslaughter or involuntary manslaughter, his ineffective assistance of counsel claim fails.

6. On the last two pages of Scott's opening brief, he makes a cursory argument that the trial court's errors, combined with his trial counsel's deficient performance, resulted in cumulative error requiring a new trial. See *State v. Lane*, 308 Ga. 10, 14 (838 SE2d 808) (2020). Assuming, without deciding, that this was sufficient to preserve a cumulative-error claim, the claim nonetheless fails.

> To establish cumulative error a defendant must show that (1) at least two errors were committed in the course of the trial; (2) considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial.

Id. at 21 (citation omitted).

With the exception of Scott's claim that the trial court violated the continuing-witness rule by sending Ware's death certificate back with the jury, we have rejected all his claims of trial court error and deficient performance by trial counsel. That one assumed trial court error, which is individually harmless, is insufficient to establish cumulative error. See *Anglin v. State*, 312 Ga. 503, 514-515 (863 SE2d 148) (2021).

*Judgment affirmed. Peterson, CJ, and Bethel, Ellington, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*